STAFFORD STATE BANK, A PROPOSED BANKING COR-
PORATION OF THE STATE OF NEW JERSEY, APPEL-
LANT, v. RICHARD F. SCHAUB, COMMISSIONER, STATE
OF NEW JERSEY, DEPARTMENT OF BANKING, RE-
SPONDENT, AND CITIZENS STATE BANK OF NEW JER-
SEY, A BANKING CORPORATION OF THE STATE OF
NEW JERSEY, APPELLANT, v. RICHARD F. SCHAUB,
COMMISSIONER, STATE OF NEW JERSEY, DEPART-
MENT OF BANKING, RESPONDENT.

IN THE MATTER OF THE APPLICATION OF THE BAY
STATE BANK FOR A NEW BANK CHARTER TO BE LO-
CATED BETWEEN 15TH AND 16TH STREETS ON THE
NORTHWEST SIDE OF LONG BEACH BOULEVARD,
BOROUGH OF SHIP BOTTOM, COUNTY OF OCEAN,
STATE OF NEW JERSEY.

Superior Court of New Jersey
Appellate Division

Argued June 15, 1976—Decided July 9, 1976.

Before Judges MATTHEWS, LORA and MORGAN.

*Mr. E. Robert Levy* and *Mr. Michael E. Levin* argued the cause for appellant Stafford State Bank (*Messrs. Marcus, Rosen, Breslow, Levy, Jaffe & Fiorello* and *Messrs. Matthews, Levin & Shea,* attorneys).

Mr. *Steven S. Radin* argued the cause for objector-appellant Beach Haven National Bank and Trust Company, (*Messrs. Sills, Beck, Cummis, Radin & Tishman,* attorneys).

A brief was filed on behalf of objector-appellant Citizens State Bank by Mr. Malcolm S. Zlotkin (*Messrs. Shackleton, Hazeltine & Zlotkin,* attorneys).

Mr. *T. Robert Zochowski* argued the cause for applicant, Bay State Bank.

Mr. *Michael E. Goldman,* Deputy Attorney General, argued the cause for respondent Commissioner of Banking, State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

Per Curiam. This appeal concerns primarily the procedural entanglements and consequences thereof resulting from the competitive attempts of two banks to establish themselves as newly chartered home office banks serving essentially the same trade area. At issue is the concept of "priority" and the effect thereof on the disposition of competing applications for bank charters. Also involved, however, is the propriety of considering the consequences of so-called "home office protection" in determining which of two competing proposed banks, both meeting statutory criteria, should be granted its charter.

The two proposed banks are Stafford State Bank (Stafford), to be located in the commercial hub of Manahawkin, Stafford Township, on the mainland off the causeway connecting the mainland to Long Beach Island, and Bay State Bank (Bay State), to be located between 15th and 16th Streets on the northwest side of Long Beach Boulevard, Ship Bottom, on Long Beach Island, about four miles from the proposed Stafford facility. Little informational detail concerning Bay State's site is supplied in either the hearing

officer's report or the Commissioner's decision, although the memorandum after his decision, supplied us in connection with this appeal, characterizes it as "quite attractive." The Stafford site is in a 17-acre plaza accommodating a Shop Rite supermarket, Grant's department store, and many other retail facilities. The center contains 96,000 square feet of building space with parking for 900 vehicles, and the hearing officer's report disclosed an intended expansion of 36,000 additional square feet of building space.

The Borough of Ship Bottom, the municipality in which Bay State wishes to locate, is located in the geographic center of Long Beach Island, a long, narrow island paralleling the coast of southern Ocean County, and in close proximity to the causeway which connects the Island to the mainland. It has a present permanent population of 1,100, and the hearing officer's report, not rejected by the Commissioner, concluded that significant population growth in the permanent population will probably not be experienced during the years to follow in the short to intermediate term. The reason given for this less than optimistic projection of population growth rate is the Coastal Area Facility Act and the Critical Area Act; the entirety of Long Beach Island is affected by either or both of these legislative enactments. Of course, during the summer months, the Island routinely experiences a substantial summer population explosion. Nonetheless, because of these modest estimates of growth on the Island, the Commissioner concluded that Bay State's existence and success will depend upon penetration into the mainland area, "an area in which Stafford would possess an obvious locational advantage." At present the Beach Haven National Bank and Trust Company (Beach Haven), an objector to both applications, operates six offices in several of the municipalities on the Island and one branch in Manahawkin. In addition, the Jersey Shore Savings and Loan Association operates a Ship Bottom office and recently received approval to operate a branch along Route 72 in Manahawkin. First Federal Sav-

ings and Loan Association of Hammonton also maintains a branch in or about Manahawkin.

Stafford Townhip, located on the mainland to the west of Long Beach Island, is wedged between Little Egg Harbor Township to the south and Union Township to the north. The township has experienced growth in population and economic development which outperforms, on a percentage basis, that experienced on the Island, and according to the hearing officer and the Commissioner still possesses potential for significant population and economic growth.

Following an interminable number of interim procedural steps, the significant aspects of which will be discussed below, the Commissioner, following separate hearings on each application and separate recommendations and reports from two different hearing examiners, concluded that both banks met all statutory requirements and that both, assuming the other did not exist, would be profitable and would serve the public interest. Because of his conclusion that both could not profitably coexist and Bay State had priority, the Bay State charter was ultimately granted and the Stafford charter was denied.

The only reason for the rejection of Stafford's charter was the granting of Bay State's. The Commissioner's decision stated:

> Had it not been for the Bay State approval, the instant application would have been approved based upon the report of Mr. Persichilli, the evidence of record, and the exceptions and replies submitted thereafter. However, the presence of another new charter with a trade area which substantially overlaps that projected by the Stafford, requires me to find negatively on public interest grounds.

The only reason for granting the Bay State charter first, and thus being forced, on public interest grounds, to reject the Stafford application was the Commissioner's conclusion that Bay State had "priority," that is, its application for a charter had been accepted by the Department before Stafford's. Stafford, one of the appellants herein, challenges that finding, contending that it had priority, and further contends that

priority, in any event, should not be the governing consideration in deciding which of two competing charters to grant. The other appellant herein, Beach Haven, clearly seeking to preserve the virtual monopoly over the banking market it has enjoyed for years on Long Beach Island, contends, without merit, that the Commissioner erred in reopening the Bay State matter after having initially denied its charter and then reversing himself.[1] The circumstances of this reversal of a prior decision will be treated only tangentially in connection with the priority issue.

The facts germane to priority, the central issue in this appeal, are as follows: Stafford's application was the first filed and accepted; its application was filed on April 17, 1973 and accepted by the Department on May 7, 1973. It is upon this undisputed fact that Stafford bases its claim to priority. The problem with this position is that on June 26, 1973 Stafford filed an amended certificate of incorporation to reflect a change in the site of the proposed bank, a site about a mile distant from the one referred to in the initial application. This amended certificate, the bank's application, was accepted by the Department on June 28, 1973. Bay State's application was, however, accepted the day before on June 27, 1973, and this one day disparity in the Department's acceptance of these two applications provides the reason for favoring Bay State. This was made clear in the Commissioner's decision and order denying Stafford's charter:

Since the time Mr. Persichilli submitted his Report and Recommendation, the Department approved a State bank charter application for the proposed Bay State Bank in Ship Bottom, Ocean County (December 1, 1975). The Stafford State filed the requisite Certificate of Incorporation and statutory affidavits on June 26, 1973. [2] The application was formally accepted on June 28, 1973. The Bay State Certificate of Incorporation and Statutory affidavits were accepted by the Department on June 27, 1973, one day prior to the Stafford State acceptance, thereby giving Bay State priority.

---

[1] Stafford also joins in that contention.

\* \* \* In light of the priority of the Bay State application and the obvious effect that each application would have on the other, I further ordered that the instant application and the Citizens State Bank branch application be stayed pending final decision on Bay State. \* \* \*

Hence, the Commissioner's conclusion that Bay State had priority based upon the one day disparity in acceptance dates provided the essential basis for granting Bay State its charter, thereby rendering it necessary that the Commissioner reject Stafford's in accordance with his view that both banks could not profitably coexist.

The essential chronology of significant events following the acceptances of the two applications must be referred to in order to better understand the respective positions taken by the banks and to evaluate the Commissioner's actions in regard thereto. The hearing on the Bay State application was scheduled to commence first, on September 17, 1973, and continued thereafter for a period of eight days, concluding on October 24, 1973. Stafford's hearings commenced about two weeks after the first day of the Bay State hearings, on October 1, 1973, and continued thereafter, with substantial interruptions caused in part by an unsuccessful application for leave to take an interlocutory appeal, and dilatory conduct by the objectors,[3] and ended after 19 days of highly

---

[2]The account of the earlier Stafford filing (April 17, 1973) and acceptance (May 7, 1973) was given in a footnote to the quoted section. The later simultaneous withdrawal and refiling of Stafford's application in November 1973 was ignored in the opinion perhaps because of the view expressed in a memorandum opinion of the Appellate Division in disposing of one of the interlocutory appeals viewing such action as a mere amendment to the application.

[3]The following is only a small excerpt taken from the hearing officers report to the Commissioner reflecting to a small degree the exasperation and helplessness felt at the objector's "procedural plan which bordered on contempt":

\* \* \* The cross-examination of each director proved to be repetitive and cumulative. The first four hearing days occasioned 617 pages of testimony, and only three directors testified. Unfortunately,

contentious proceedings on June 5, 1974. By the time the Stafford hearings finally came to a conclusion, the affirmative report and recommendations in the Bay State matter had been filed, April 1, 1974. These recommendations for granting Bay State's application were, however, rejected by the Commissioner and the charter denied on October 17, 1974, on grounds of inadequate prospects of profitability and lack of qualifications of the proposed interim directors, the latter ground predicated upon the Commissioner's distinctly negative view of the financial transactions leading to acquisition of the Bay State site. On November 18, 1974, about a month later, the affirmative report and recommendations from the hearing officer in the Stafford application were filed. About a week and half before, however, Bay State had taken the unprecedented step of filing a petition to reopen and to have the Commissioner reconsider its application, contending that the Commissioner had erred in reaching his conclusions on both grounds of profitability and qualifications of its personnel. Hence, at the time Stafford's favorable recommendations had been filed, Bay State's charter had already been denied although a petition for reconsideration had been submitted but not acted upon. Later on Bay State submitted evidence to the Commissioner of a restructuring of the financial transactions of which the Commissioner had previously ex-

---

objecting counsel spent the major portion of their examinations attempting to establish a myriad of unsavory relationships rather than confine their cross-examination to meaningful relevant probative areas. * * * In fact, it was brought to the undersigned's attention that one Appellate Court justice (re appeal mentioned supra) saw fit to characterize the aforesaid 617 pages of testimony as "drivel." Whether this remark was appropriate, correct, or taken out of context is immaterial. However, it is noted for the benefit of the Commissioner, not by way of explanation, but to highlight to the fact the undersigned afforded the greatest latitude to each attorney in his cross-examination of the applicant's witnesses. A review of the record proves that such latitude was excessive. When the hearing reconvened, the tone of the cross-examination was little more than a repeat performance. Efforts to restrain this undue consumption of time proved futile. * * *

pressed disapproval.[4] Action on the Stafford application, and the favorable recommendation with respect thereto was deferred, however, pending disposition of Bay State's petition for reconsideration. Partial disposition of this petition was made first on May 16, 1975 when the Commissioner reversed himself on the issue of profitability and reopened the Bay State matter to reconsider the issue of the directors' qualifications.

Action on Stafford's application continued to be held in abeyance, and on June 14, 1975 Stafford and Beach Haven, both objectors to the Bay State application, sought leave to take an interlocutory appeal from the Commissioner's reopening of the Bay State matter. Leave was denied on June 23, 1975. In July Stafford and Citizens[5] instituted a suit in the Law Division in lieu of prerogative writs, seeking to compel the Commissioner to act upon their applications, citing primarily *N. J. S. A.* 17:9A-11 B requiring action within 90 days. That matter was properly transferred to the Appellate Division but was never resolved because, while pending, the Commissioner acted by (1) completely reversing himself on the Bay State application, granting it on December 1, 1975, (2) denying Stafford's application on January 27, 1976, and (3) granting Citizen's application on February 11, 1976. The action in lieu of *mandamus* thereby became moot. The matter was, however, retained in the Appellate Division, consolidated and accelerated for disposition on the issues of priority and the propriety of the Commissioner's action in reopening and reconsidering the Bay State application. The issue of "home office protection" was injected into the case by a memorandum by the Commissioner dated April 26, 1976, three months after the denial of Stafford's charter. The memoran-

---

[4]This later transaction was not, however, used as the basis of reversing the prior negative decision.

[5]Citizens State Bank had filed its application on July 1, 1974 for approval of a branch bank to be located in Manahawkin in close proximity to the Stafford site. See explanation *infra*.

dum was submitted to this court in connection with this appeal, primarily in defense of the present system of priority, but set forth "home office protection" as an additional reason for favoring Bay State and rejecting Stafford, a consideration unexpressed in either original decision.

For convenience of the reader, we set forth in tabular form, the chronology of essential events taken from the Commissioner's memorandum of April 26, 1976:

| | Bay State | Stafford State |
|---|---|---|
| Certificate of incorporation, affidavits and check received | June 21, 1973 | April 17, 1973<br>June 26, 1973 |
| Application accepted per *N. J. S. A.* 17:9A–10 | June 27, 1973 | May 7, 1973<br>June 28, 1973<br>Nov. 19, 1973 |
| Hearings scheduled | (a) On 6/2/73 for 8/27/73<br>(b) On 7/10/73 for 9/17/73 | (a) On 7/18/73 for 10/1/73<br>(b) On 12/19/73 for 2/19/74<br>(c) On 2/22/74 for 4/23/74 |
| Actual hearing dates | Sept. 17, 19, 21, 25, 26<br>Oct. 4, 15 and 24, 1973 | (a) Oct. 1, 2, 3, and 5 (1973)<br>(b) Feb. 19, May 1, 2, 6, 7,<br>13, 14, 15, 16, 20, 21,<br>28, 29, 30<br>June 5, 1974 |
| Date of report and recommendation | April 1, 1974 | November 18, 1974 |
| Date of decision | (a) Oct. 17, 1974<br>(b) May 16, 1975<br>(c) Dec. 1, 1975 | January 27, 1976 |

For completeness, the circumstances surrounding the Citizens State Bank's application for branch bank approval should be described, although its application, approved on February 11, 1976, is not at issue in this appeal. Citizens' application was filed on July 1, 1974, well over a year after the charter applications of Bay State and Stafford had been accepted. Prior to that it had appeared as an objector to the Stafford application. The proposed site for the Citizens' branch was in Manahawkin, in close proximity to the proposed Stafford facility. Citizens, having filed the latest application, never made any claim to priority. Nonetheless, it achieved success over Stafford only because Bay State had prevailed over Stafford on its one-day priority claim: according to the Commissioner's decision approving Citizens' branch, although Bay State could not profitably coexist with Stafford because the latter's potential for deposits in the trade area to be served by Bay State was too great, it could coexist with the more modest Citizens' facility because the latter's projected deposit potential was about 50% of what Stafford anticipated it would obtain; hence, since Citizens was less of a threat to Bay State's profitability and Bay State's charter had to be granted because of its one-day priority, Citizens' branch was approved despite the fact that it could make not even a claim to priority. As noted in the Commissioner's decision approving Citizens' branch:

The real issue is whether the establishment of the proposed Citizens' branch will economically endanger the Bay State and consequently the banking structure at large. My finding is that it will not. A branch office does not, and will not in this instance, have the same effect as the simultaneous entry of a new bank charter serving the same area. Inherently, a new branch office does not require the same level of deposits as a new charter in order to achieve statutory profitability. * * * The findings on deposit potentials in the Citizens and Stafford applications highlight this fact. Herein, I have found it reasonable for Citizens to attract deposits of approximately $4 million by the end of the third year of operation. Stafford State Bank, on the other hand, was projected as being likely to attract approximately $8 million in deposits by the third year of operation. This difference will permit the Bay State to become statutorily

profitable, thus preserving the viability of the area's banking structure.

Hence, it is clear that the essential foundation for the disposition of all three applications, Bay State's and Stafford's involved in this appeal, and Citizens' not here involved, was the one-day priority granted Bay State.

The challenged priority rule is not derived from statute; none of the governing enactments refer to it. We have found no helpful case law or academic comment. No written regulation adopted by the Department describing its application refers to it. Rather we have been informed by the Commissioner's memorandum of April 26, 1976 submitted in connection with this appeal that by informal rule the Department of Banking has long followed the procedure whereby the first application for an area accepted will be the first application decided, "all things being equal."

Accordingly, the Commissioner deferred action on the Stafford application, despite his initial denial of Bay State, because he was reluctant to disturb Bay State's priority on the basis of a mistake he may have made. The rule, however, does not require the granting of the earlier application; it only requires the Commissioner to decide that application first. If the earlier applicant fails to meet statutory criteria, its priority will avail it nothing. On the other hand, if the earlier applicant meets statutory criteria, the application will be granted, notwithstanding the superior ability of the later charter to better fulfill the public interest.

Hence, the concept of priority, importing as it does a right to preferential treatment, is antithetical to the statutory command that the public interest be the predominant consideration to the extent that it relieves or forecloses the Commissioner from deciding which of several competing banks, all meeting statutory criteria, would best serve the public. See *Application of Howard Savings Inst. of Newark,* 32 *N. J.* 29, 48 (1960). In following the informal rule of priority, as the Commissioner did in this case, the public is

deprived of having the Commissioner decide which of several qualified banks would be the most suitable.

We agree, however, with the Commissioner that some form of priority is, in some circumstances, vital to the ability of the Department to function at all. The system devised should, therefore, afford the greatest latitude within which the Commissioner may protect that public interest by approving the best of several banks' charters for the area while at the same time minimizing the foreseeable problems which would be encountered in the absence of any priority system at all. The rule followed regarding priority must not reach beyond the necessity for its creation.

In his memorandum of April 26, 1976 the Commissioner, in defense of the present system of priority, points to several problems he foresees would be encountered in the absence of any priority system at all. "Defensive applications," by which an objecting institution motivated to preserve the *status quo* as to competition or the lack thereof would file an application for entry into the area, "thus increasing its chances of defeating the possible new entry," are one such problem. In deference to the Commissioner's expertise, we accept his view that such applications do constitute a sufficient problem to warrant a priority rule while, at the same time, confessing that we have some difficulty in fully appreciating his position. As he notes later on in his memorandum, "defensive objections" are routinely filed, one pertinent example being the Beach Haven objection to both the Bay State and Stafford applications in the present matter, both designed to protect the *status quo* of an absence of competitive banking facilities on Long Beach Island. Bay State objected to Stafford's charter; Stafford objected to Bay State's; Citizens' objected to Stafford's, etc. At least where the "defensive" action takes the form of an application for entry into the area, the public stands to obtain some benefit if the fairly contemporaneous, although later applicant, will better serve its needs.

The Commissioner also notes the spectre of "defensive applications" by national banks and federal savings and loan associations, ordinarily decided with greater dispatch than applications for state charters because of differences in procedure. That may be so, and we are in no position to comment thereon. Nonetheless, the present priority system will not affect the speed with which the Comptroller of the Currency disposes of applications, and we do not deem it necessary that any reasonable system of priority take into account pending federal applications.

Moreover, the Commissioner, with justification, points to the necessity of preventing eleventh hour applications filed, for example, just before disposition is to be made of an earlier application. Clearly, in such circumstances, action on the previously filed application should not be delayed in order to determine the comparative merits of the later application because there would be nothing to prevent an even later application for the same area from being filed which would, in the total absence of a system of priority, interfere with disposition of the two earlier applications, Some system of priority is clearly in the Department's, the banks' and the public's interest, since without it the Department would be immobilized.

The unadorned informal rule of priority presently followed by the Department has the virtue of simplicity, at least in its statement. Its lack of specificity, its very simplicity, making no allowances for the many contingencies which the Commissioner sets forth in his memorandum, makes it frequently difficult in application, as witness what occurred in the present matter. What is the effect on priority of an amendment to an accepted certificate of incorporation? What is the effect of a withdrawal and refiling for an objective which could have been accomplished by amendment? What is the effect of a request from the earlier applicant for delay in disposition, or a delay necessitated by a legal problem requiring opinion from the Attorney General, or an interlocutory appeal taken by an objector? Are all amendments, re-

gardless of their materiality, to be viewed as having effect on priority? What is meant by the Commissioner when he states in the rule, "all things being equal"? How can he determine whether all things are equal before he considers the competing applications?

We are not equipped, lack power, and decline to set forth a rule concerning priority; that is the Commissioner's function. We agree with the Commissioner that any rule of priority inescapably injects an element of arbitrariness into the process of disposing of charter and branch bank applications to the extent that it places a limit on the Commissioner's ability to decide which of several banks competing for charters in the same trade area would best serve the local public's banking needs. The purpose of any proper rule of priority should be to avoid unnecessary limitations on the Commissioner's ability in that regard while at the same time minimizing the problems which would be encountered in the absence of any rule of priority. In other words, the rule should maximize the Commissioner's ability to serve the public while preserving the ability of the Department to function administratively. Where the balance should be struck we leave to the Commissioner.

The rule devised should permit the public to derive from fairly contemporaneous filings the benefit of being served by the best bank for its needs, rather than being deprived thereof merely because one application lagged hours or days behind another. As the public benefits from competitive banking facilities so it should benefit, to the extent administratively possible, from competition among proposed entrants into a trade area. Such fairly contemporaneously filed applications, as that term will be defined by the Commissioner, should ideally be heard together (particularly where so requested by one of the applicants) so that the Commissioner will have the benefit of the recommendations of the hearing officer thereon and exceptions filed by the parties relating to that issue. If one of the competing banks unduly delays proceedings, the matter can be severed, and priority can be vested

in the bank ready to proceed, at the Commissioner's discretion, or in accordance with rules he adopts and makes known to advise competing banks in advance of the consequences of their actions. The joint hearing of competing charter applications will also go some distance toward avoiding what occurred in connection with the Stafford hearing when one set of objectors through their zeal in obstructing progress of a hearing managed to defer its termination to the detriment of the applying bank.[6]

Because we hold that the present rule of priority is arbitrary and unreasonable, contrary to statutory command, and not in the best interest of the public, we find it unnecessary to rule on Stafford's contention that by its April 1973 filing it obtained priority undisturbed by its later amendments or refiling of its application.

■ We take sharp issue with the statement by the Commissioner in his memorandum that "it would be improper to decide which application (Bay State's or Stafford's) best served the public interest based upon individual considerations such as site, location, deposits, etc." Accordingly, because of the present priority rule no such comparative evaluation of the two competing charters was made. This was error.[7] The granting of any bank charter is conditioned upon the Commissioner's determination that "the interest

---

[6]The hearing officer's report in the Stafford case is overflowing with indignation at the tactics employed by the objecting banks. Had Stafford's recommendation been earlier issued, the result of this case could very well have been the reverse of what it was.

[7]In the record, however, and in his memorandum the Commissioner made the following observations:

\* \* \* For the record, of the two applicants, Stafford State Bank has the best physical location, with the attendant visibility and traffic. It is also located nearer a commercial hub than is Bay State Bank. Nevertheless, Bay State's location is also quite attractive. Given separate approvals, it is likely that Stafford's deposit levels would exceed those which Bay State could achieve. Of course, higher deposits cannot be translated *ipso facto* into greater interest to the public, although it can be one indication.

of the public will be served to advantage" by the proposed bank. *N. J. S. A.* 17:9A–11D(1). Where two banks are vying for the same trade area, considerations of priority aside, the Commissioner's obligation is to determine which of the two applications will best serve that interest. Indeed, the Commissioner himself, in his brief submitted to this court in opposition to Stafford's attempt, by way of action in lieu of *mandamus,* to compel him to reach an early de-cision, accepted this view of his obligation:

By considering all three applications together, the Commissioner can determine which of the applicants will serve the interests of the public most advantageously in the event that the trade area is found not to be able to support two new banks and one additional branch office of an existing bank. * * * [8]

This statement on behalf of the Commissioners in justification of his delaying determination of the Stafford application accurately expresses our view of his obligation. To permit establishment of the bank with a less attractive site, with lower deposit projections, with a lesser variety of service, does the public a disservice even though that bank otherwise meets statutory criteria, and violates the fundamental mandate under which the Commissioner operates, to consider the public interest as paramount in the determination of the advisability of a bank charter. Since priority under the presently prevailing rule has been held an insufficient basis for determining which of the two competing charters should be granted, and since the Commissioner declined to decide which of the two applications would best serve the public interest to greater advantage, we remand this matter to the Commissioner for such a determination. As guidance in this unique case, we add the following observations.

8Interestingly, in that brief, the Commissioner relegates the priority consideration to footnote status, observing only that Stafford's claim to priority is "somewhat clouded." Nowhere in that brief does he assert that priority is the reason for deferring determination of the Stafford application.

First, according to the Commissioner's own determinations, both banks will serve substantially the same trade area; he took the view that the trade areas overlapped to a 90-95% extent. Both banks would therefore equally serve to relieve the population on the Island of the virtual monopoly enjoyed by Beach Haven over many past years.

Second, although unexpressed in the decision and order denying the Stafford charter, but given as a reason in addition to priority for the Commissioner's choice of Bay State over Stafford, was the consideration of "home office protection." Thus, he notes that the "home office protection" flowing from approval of Bay State, in Ship Bottom, a municipality of only 1,100 persons, would have less deleterious effects than giving home office protection to Stafford in the geographically larger Stafford Township with a population of 4,500 and more promising future with respect to future population and commercial growth. As stated in his memorandum, "approval of the Stafford State Bank would require a very large and growing township to be deprived, for an undetermined number of years, of additional competition, despite the fact that it is a commercial hub in the area." Although we are unsure whether such a consideration played a role in the Commissioner's rejection of Stafford's application because unexpressed in his decision and order (see *N. J. S. A.* 17:9A–11 B), we address ourselves to the appropriateness thereto since it has been projected as, at least, an additional reason for rejection.

The "home office protection" to which reference has been made derives from the 1973 amendment to *N. J. S. A.* 17:9A–19. Sections G, H, I, J and K thereof set up the extent of the protection for competition from branch banks afforded to the home office of a banking institution according to a schedule of years, with the extent of protection diminishing on a yearly basis in accordance with population in the municipality. Thus, for example during 1973, the first year in which the amendment was effective, principal offices of banking institutions were accorded protection only in mu-

nicipalities in which the population was less than 50,000 persons. In the following year, 1974, such protection was afforded only when the municipality's population in that year did not exceed 40,000. In 1975 the protection became more limited and applied only when the population in that year did not exceed 30,000. In 1976 the protection was again limited and applied only when the population in that year did not exceed 20,000 persons. In 1977, the first year in which either Bay State or Stafford could become operational, the protection was finally limited and will be applied only when the population does not exceed 10,000 persons. Hence, when Stafford Township, presently with a 4,500 person population, reaches 10,000 in population, all protection against new branch banks will cease. To that extent the Commissioner's statement that the protection would persist for an undetermined number of years is accurate; no one can know how long it will take Stafford Township to achieve that population level.

We do not, however, view such considerations as appropriate to a determination of which charter application should be approved. By its enactment of *N. J. S. A.* 17:9A–19 the Legislature has determined that providing the protection within the population limits prescribed will both further the public interest in protecting new locally-based home office banking facilities while at the same time not unduly depriving that same public of banking facilities adequate to its needs. Hence, for the year 1977 the Legislature has determined that until Stafford Township attains the 10,000 population level a principal office will adequately meet the public demand for banking facilities. This is, of course, without reference to such branch banks as may be functioning prior to the establishment of the new bank. Whatever one may think of the wisdom of this enactment, the Commissioner is not, in our view, permitted to reach a conclusion at variance with the conclusion expressed in the legislation itself, that a new bank operating within those modest population limits would not be sufficient, and predicate charter approval or disap-

proval on that basis. If, as the Commissioner apparently believes, Stafford Township has greater growth potential than Ship Bottom, such growth will be reflected in increasing population levels, and when the statutory level of 10,000 is attained, home office protection in that township will cease. If, on the other hand, the Commissioner is incorrect in his predications, and the projected growth does not occur, then additional banking facilities may well be unnecessary. The Legislature in this enactment has taken into account the needs of a growing population for additional and competitive banking facilities and made what it considers adequate provision for them; such an enactment should not be converted into an obstacle against establishment of new banks in areas where they may be most needed just because of prospects of rapid residential and commercial growth. Hence, implementation of the Commissioner's approach has permitted the establishment of only a branch bank in the larger municipality (larger in land area and population) projected for rapid population expansion, while permitting a new bank in a small municipality with more limited growth possibilities and presumably with less need for "innovative and consumer oriented policies" the Commissioner views as characteristic of newly chartered banking institutions. Such a result is clearly out of harmony with the policies manifested in *N. J. S. A.* 17:9A–19 and the approach taken by the Commissioner is therefore inappropriate.

Moreover, and on a more pragmatic level, nothing in the Commissioner's discussion of the impact of home office protection on his disposition of the Bay State and Stafford charter applications suggests that he took into account branch bank facilities already existing in Stafford Township. Beach Haven maintains a branch in Manahawkin and the Commissioner has granted Citizens' application for a branch to be located in close proximity to the Stafford site. Hence, as noted in the hearing officer's report and recommendations with respect to the Stafford matter, not rejected by the Commissioner, there is no void in banking facilities in this

area of southern New Jersey. The trade area to be served by the proposed Stafford facility already hosts four other commercial bank facilities, presumably competitive with the one Stafford wishes to open. Therefore, on a factual level, there seems to be no basis to the Commissioner's concern expressed in his memorandum that Stafford Township with a present population of only 4,500 would be deprived of "additional competition" for an undetermined number of years.

In this connection the Commissioner himself in another context, noted, somewhat inconsistently we may add, with his stress on home office protection as one basis for preferring the Bay State application, the present existence of substantial competition for the proposed Stafford facility in the trade area:

> Stafford Township too could sustain and would be benefited by a new charter home office bank. However, due to the fact that competition exists to its north, south and east, and because it is not subject to the peculiar geographic factors affecting Long Beach Island, the desirability and need, in the context of the public interest, is not as great.

With this abundance of competition in the area with only a 4,500 population level, the Commissioner's concern for lack of "additional competition" in this same area until a 10,000 population level is achieved seems somewhat exaggerated. His reasoning appears self-contradictory; because future competition in Stafford Township from branch banks would be foreclosed by home office protection, Bay State is favored; because competition for Stafford presently exists, Bay State is favored.

Since in the context of this case we have already rejected considerations of priority, the only reason given for denying the Stafford charter, and since we have held considerations of home office protection to be inappropriate in the determination of which of two proposed banks, competing for the same trade area, should be permitted to function, we

remand to the Commissioner for his determination of which of the two banks will best serve the interest of the public without regard to priority and home office protection. In this endeavor, he should consider the relative attractiveness of the sites, the services to be offered, the relative levels of potential deposits to be garnered by each bank, and other such considerations ordinarily used by the Commissioner in determining whether a charter should be granted.

Accordingly, the approval given Bay State is reversed, the denial of Stafford's application is similarly reversed, and the matter is remanded to the Commissioner of Banking for further determination in a manner consistent with this opinion. Jurisdiction is not retained. No costs.